

FILED

2011 APR 25 D 3 46

U.S. DISTRICT COURT
EASTERN DIST. TENN.

DEPT. CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | |
|---|---|
| FORD MOTOR COMPANY, a Delaware corporation,<br><br>       Plaintiff,<br><br>vs.<br><br>HERITAGE MANAGEMENT GROUP, INC., a Tennessee corporation, and MARC A. COLLINS, an individual,<br><br>       Defendants. | **PLAINTIFF FORD MOTOR COMPANY'S MEMORANDUM OF LAW IN SUPPORT OF FORD'S APPLICATION FOR *EX PARTE* SEIZURE ORDER AND MOTION FOR *EX PARTE* TEMPORARY RESTRAINING ORDER AND EXPEDITED DISCOVERY**<br><br>Civil No.: 1:11-CV-92<br><br>Hon. Curtis L. Collier<br><br>Magistrate Judge Susan K. Lee<br><br>**FILED UNDER SEAL** |

Plaintiff Ford Motor Company ("Ford"), through counsel, respectfully submits this Memorandum of Law in support of: (1) Ford's application for the entry of an *ex parte* order to seize goods bearing counterfeits of the FORD®, FORD Script in Oval®, MOTORCRAFT®, and/or the Speeding Car Design® trademarks (collectively the "Ford Marks"), the means of making such marks, and any records documenting the manufacture, sale, or receipt of all things involved in the Defendants' infringement; (2) Ford's motion for *ex parte* temporary restraining order immediately restraining the Defendants from: (a) selling, offering for sale, manufacturing,

supplying, distributing, or advertising any goods or services, or any labels or packaging, bearing

any unauthorized or non-genuine Ford Marks, or any other mark that is likely to cause confusion

among consumers and/or the public; (b) destroying, erasing, or altering any evidence relevant to

the issues raised by the Verified Complaint on file in this matter; and (c) discussing or notifying

any party of this action or any order issued in this action, including the Defendants' suppliers,

manufacturers, or distributors, until such information is of public record; and (3) Ford's motion

seeking expedited discovery from Defendants.

The *ex parte* seizure and temporary restraining orders requested by Ford are expressly

provided for under Section 34 of the Lanham Act, 15 U.S.C. § 1116, and well settled case law

instructing that these are appropriate remedies to prohibit further distribution of counterfeit

marks and infringing goods in the marketplace, thereby preventing harm to consumers.

As detailed more fully herein and as supported by the Verified Complaint, and the Declarations

of Jason S. Kosofsky, Jack Russell, Ernest Modock, Jr., John Insogna, and Wayne H. Smith,

filed contemporaneously herewith, Defendants Heritage Management Group, Inc. ("Heritage")

and Marc A. Collins ("Collins") (collectively "Defendants") have been using counterfeits of the

Ford Marks in connection with the sale, offering for sale, or distribution of automotive parts,

including remanufactured fuel injector assemblies. Pursuant to 15 U.S.C. § 1116(d)(8), the order

for *ex parte* seizure, together with all supporting documents, shall be placed under seal until after

the goods at issue have been seized and Defendants have an opportunity to contest such order.

## STATEMENT OF FACTS

### I.   THE FORD MARKS

Ford is the owner of numerous federal registrations for the Ford Marks, several of which

have been deemed incontestable. Verified Complaint ("Compl.") ¶¶ 11-16 & Exs. A-D;

Declaration of Jason S. Kosofsky ("Kosofsky Decl.") ¶ 3. Ford manufactures and markets high

quality automobiles and related products, parts and services under its world famous Ford Marks, including fuel injector assemblies. Compl. ¶¶ 9-11; Kosofsky Decl. ¶ 4. Ford has spent hundreds of millions of dollars and has expended significant effort in advertising, promoting, and developing the Ford Marks throughout the United States and around the world. Compl. ¶ 17. As a result of such advertising and expenditures, the Ford Marks have become widely known and recognized throughout the world as symbols of high quality automotive goods and services. *Id.* The Ford Marks are world-famous and distinctive, and have become associated by the consuming public exclusively with Ford. *Id.* These marks are an invaluable asset of substantial and inestimable worth to Ford and Ford has built a valuable reputation and substantial goodwill associated with these marks. *Id.* Further, the Ford Marks enjoy unquestionable fame and a very broad scope of protection as a result of extensive use and favorable public acceptance and recognition. *Id.*

## II.    FORD'S BRAND PROTECTION MEASURES

Ford's Customer Service Division investigates allegations of counterfeiting and infringement of Ford's trademarks around the world through its Global Brand Protection Group. Compl. ¶ 18. The Global Brand Protection Group works with Ford's engineers and designers to include a number of different counter-measures in genuine Ford products to allow Ford to identify counterfeit and infringing products or packaging in the marketplace. Compl. ¶ 19. These security features are secret, covert, and embedded, and allow Ford to identify genuine products and packaging, authorized by Ford. Compl. ¶ 19; Kosofsky Decl. ¶ 5. Ford's Brand Protection Group obtains leads from within and outside of the company. Compl. ¶ 20. They occasionally place orders to entities suspected of distributing counterfeit or infringing products, or otherwise seek to obtain samples of suspected counterfeit products for purposes of

examination and investigation. Compl. ¶ 20. Ford's Brand Protection personnel then examine such products and packaging to determine the authenticity of the subject items. Compl. ¶ 20.

For safety and quality reasons, Ford maintains careful control of its parts inventory. Kosofsky Decl. ¶ 4. Only authorized suppliers may manufacture, engineer and distribute parts bearing or packaged with the Ford Marks, or any other Ford trademark. *Id.*

As part of Ford's quality control program, and specifically with respect to packaging and labels for parts, Ford incorporates certain security features in its product packaging, which are known only to Ford, and which allow Ford to identify and distinguish genuine and authorized products from counterfeits. Kosofsky Decl. ¶ 5. In order to implement this control process, Ford has a single-source supplier for its FORD® and MOTORCRAFT® labels for the packaging Ford uses on its products, including the type of parts at issue in this case, namely, fuel injector cores and assemblies. Kosofsky Decl. ¶ 5. There are multiple levels of security features that Ford has added to its labels sourced through Ford's single supplier. Kosofsky Decl. ¶ 6. Ford has specifically approved the supplier's control process for Ford's packaging labels. *Id.* Therefore, only Ford, and specifically Ford's Brand Protection personnel, are aware of all of the security measures that Ford has implemented, and only such trained personnel are able to determine whether the security features are absent from a particular packaging label. *Id.* If these features are not present and visible, the label cannot be genuine. *Id.*

In addition to imbedded and covert security features of labels and packaging, there are other obvious, non-secret indicators that can help to identify labels and packaging as counterfeit, such as the use of low quality printing methods. Kosofsky Decl. ¶ 7. Ford's single-source label company does not print labels for genuine Ford packaging on low quality printers, such as dot-matrix printers. *Id.*

## III.    EVIDENCE PROVING SALES OF COUNTERFEIT PARTS BY DEFENDANTS

Ford's Brand Protection Group personnel received a lead indicating that counterfeit packaging was being used in connection with the sale of fuel injectors for Ford F-Series trucks. Thus, Ford undertook an investigation, which led Ford to gather proof that Defendants have been selling parts in counterfeit "FORD MOTORCRAFT" packaging, as set forth more fully below. Kosofsky Decl. ¶¶ 8-17.

Ford's Brand Protection personnel initially examined some samples of packaging that had been used in connection with fuel injector cores and assemblies that Ford understood have been returned to a core return location by one of Ford's dealerships, Mountain View Ford-Lincoln-Mercury ("Mountain View Ford"). Kosofsky Decl. ¶ 8. Based on their initial examination of the parts discussed above, Ford's Brand Protection personnel concluded that the samples of fuel injector cores and assemblies were contained in counterfeit packaging. *Id.* Ford's personnel based their initial conclusion, in part, on the absence of certain security features that always appear on genuine product packaging of Ford products. *Id.* Some explanation of the process through which Ford's personnel were led to suspect that the counterfeit parts were being sold to Mountain View Ford by Defendants is necessary.

Ford has a "Core Return Policy" that applies to all FORD® and MOTORCRAFT® remanufactured parts that have what is referred to as a "core charge." Kosofsky Decl. ¶ 9. The sale of a remanufactured part includes the price of the part itself, as well as an additional core charge to encourage the return of the old part for remanufacturing purposes. The core charge is a form of deposit, which is refunded to a dealership when the core part is returned. *Id.* The customer (typically a Ford dealership) returns the core in the replacement part's packaging to assist in inventory and cost control. *Id.* Packaging for remanufactured parts bear UPC barcodes to identify the part being returned to Ford. *Id.*

During a Ford Brand Protection Group investigation into this case, Ford contacted a Ford core return location that was responsible for Mountain View Ford. Kosofsky Decl. ¶ 10. Ford requested that the core return location ship fuel injector cores that Mountain View Ford had returned for core credit. *Id.* Once the parts were sent to Ford's Brand Protection Group, their packaging was reviewed and identified as bearing counterfeit labels. *Id.* One of Ford's Brand Protection Group Personnel, Mr. Jason Kosofsky, inspected the packaging of the cores returned by Mountain View Ford, as well as the returned fuel injector cores. Kosofsky Decl. ¶ 11. The cores consisted of several different remanufactured fuel injector assembly kits designated under Ford Part Numbers 4C3Z-9E527-BRM, 5C3Z-9VE527-BRM, and 8C3Z-9E527-A. *Id.*

After a careful inspection of the items returned to the core location by Mountain View Ford, Mr. Kosofsky determined that the labels utilized for each of the suspect returns were counterfeit. Kosofsky Decl. ¶ 12. There were several indications identified by Mr. Kosofsky indicating that the labels were not produced by Ford's sole supplier. *Id.* A number of non-secret indicators were evident when comparing a genuine label with the counterfeit version. *Id.* A genuine FORD® MOTORCRAFT® label is reproduced below and compared with one of the labels from the early 2011 core return by Mountain View Ford:

| Genuine | Counterfeit |
| --- | --- |

glue

 

| Genuine | Counterfeit |
| --- | --- |
| •   No glue line | •   Glue line is visible |
| •   Color -- red pantone is bright red | •   Color – red pantone has an orange hue |
| •   Text in black bar is clear | •   Text in black bar is fuzzy due to scanning |
| •   Corner radius is 1/8 | •   Corner radius is 3/16 |

 

*Id.*

  After this initial examination by Ford's Brand Protection Group, in which Ford concluded that counterfeit fuel injector cores and assembly kits were being returned to Ford's core return location, Ford undertook a more detailed investigation to determine the source of the counterfeit parts and packaging. Kosofsky Decl. ¶¶ 13-22.

  As part of Ford's investigation, Mr. Kosofsky, working with other personnel in Ford's Brand Protection Group, instructed Mr. Ernest P. Modock, Jr., a Zone Manager employed in Ford's "Ford Customer Service Division" ("FCSD"), Atlanta Region, to visit Mountain View Ford, and inspect the inventory of parts at Mountain View Ford at 301 East 20th Street,

Chattanooga, Tennessee. Kosofsky Decl. ¶ 13; Declaration of Ernest P. Modock, Jr. ("Modock Decl.") ¶¶ 4-5.

Accordingly, Mr. Modock visited Mountain View Ford on March 15 and 18, 2011, and examined numerous parts and packaging in Mountain View Ford's packaging. Modock Decl. ¶ 6. Prior to his visits to Mountain View Ford, the Brand Protection Group briefed Mr. Modock regarding differences between genuine FORD MOTORCRAFT® packaging labels and suspected counterfeit labels being used on the packaging of diesel fuel injectors and injector cores for FORD® F-Series trucks, and specifically the cores that had been returned to Ford by Mountain View Ford. Kosofsky Decl. ¶ 14; Modock Decl. ¶ 6. The Brand Protection Group provided to Mr. Modock a sample of the counterfeit package and label, as well as a sample of a genuine FORD MOTORCRAFT® label to aid Mr. Modock in his inspection of the inventory at Mountain View Ford. Kosofsky Decl. ¶ 14; Modock Decl. ¶ 6.

During his examination of the parts inventory at Mountain View Ford, Mr. Modock identified a number of parts at Mountain View Ford that were contained within counterfeit packaging. Modock Decl. ¶ 7. Mr. Modock was able to make this determination using the tools and information that Ford's Global Brand Protection Group personnel had provided to Mr. Modock. *Id.* In fact, Mr. Modock determined that there were at least 155 fuel injectors in the inventory of Mountain View Ford that were contained within packaging with counterfeit "FORD MOTORCRAFT" labels. Modock Decl. ¶¶ 8, 10.

Consequently, Mr. Modock, working with Ford's Global Brand Protection Group personnel, requested that the management of Mountain View Ford segregate and quarantine the parts identified as counterfeits. Modock Decl. ¶ 8. Mr. Modock and Ford also asked Mountain View Ford for additional information and documentation regarding the source from which

Mountain View Ford acquired the counterfeit items. *Id.* Thus, at Mr. Modock's and Ford's request, Mountain View Ford segregated and quarantined 155 fuel injectors within the inventory of Mountain View Ford. Modock Decl. ¶ 11. Mr. Modock, who was present when the parts were segregated, kept a written record of the 155 parts that were segregated and quarantined, as follows:

| Part No. | Quantity |
|---|---|
| 8C3Z-9E527-A | 110 |
| 5C3Z-9VE537-BRM | 1 |
| 3C3Z-9E527E-CRM | 13 |
| 4C3Z-9E527-BRM | 31 |

*Id.*; Declaration of Jack Russell ("Russell Decl.") ¶ 7. In addition to segregating the parts determined to be counterfeit, the Parts Manager at Mountain View Ford, Mr. Jack Russell, provided to Mr. Modock and Ford copies of invoices sent to Mountain View Ford by Defendant Heritage, showing that Defendant Heritage had sold to Mountain View Ford the counterfeit parts found in Mountain View Ford's inventory, which are listed by Ford Part Number and quantity above. Modock Decl. ¶ 9; Russell Decl. ¶ 8 & Ex. A. The parts listed above were sold to Mountain View Ford by Defendant Heritage and were shipped to Mountain View Ford by Heritage. Russell Decl. ¶ 4. Mountain View Ford made the purchases of parts from Defendant Heritage over a period between July 2010 and January 2011. Russell Decl. ¶ 3.

Based on the information gathered as described above, Defendants sold parts contained in counterfeit packaging to Mountain View Ford. Indeed, the versions of the trademarks placed on the packaging labels sold by Defendants are virtually identical to the Ford Marks. Kosofsky Decl. ¶ 17. Defendants are not affiliated with or sponsored by Ford and Defendants have no authority to use the Ford Marks in the sale of goods or services that have not been manufactured,

authorized, or provided by Ford. Kosofsky Decl. ¶ 18. The type of unauthorized use of the Ford

Marks engaged in by Defendants not only creates confusion in the marketplace regarding the

source of Defendants' products, but it creates a public risk because Ford is unable to control the

quality of products distributed under the famous Ford Marks. Kosofsky Decl. ¶ 19.

## IV.    DEFENDANTS' BUSINESS PREMISES AND OTHER INFORMATION

After reviewing the Heritage invoices provided to Ford by Mountain View Ford, Ford

undertook further investigation into Defendants to determine the location(s) at which Defendants

are storing inventory and conducting business. Kosofsky Decl. ¶¶ 20-22. In doing so, Ford

retained the services of JVI & Associates ("JVI"), a private investigative firm, to gather

necessary evidence to prove the location(s) at which Defendants are doing business. Kosofsky

Decl. ¶ 21.

JVI's investigation revealed the following facts regarding Defendants, their business

operations, and the location at which Defendants are storing and shipping automotive parts.

Defendant Heritage is a Tennessee corporation, and Defendant Collins is the listed owner of

Heritage according to Tennessee Secretary of State records. Declaration of Wayne H. Smith

("Smith Decl.") ¶ 5 & Ex. B. Heritage lists its corporate address as 1480 Leighton Dr., Soddy

Daisy, TN, 37379. *Id.* Business license records of Hamilton County, Tennessee reveal similar

information regarding Heritage. Smith Decl. ¶ 4 & Ex. A. At the corporate address of

Defendant Heritage there is a residence within a residential development. Smith Decl. ¶ 6, Ex. D.

Although Heritage lists its corporate address at a residence, Heritage owns and conducts business

in a commercial building located at 6021 Dayton Boulevard, Red Bank, Tennessee, 37415 (the

"Dayton Blvd. Building"). Smith Decl. ¶¶ 7-12 & Exs. C, E, F, G, H, I. Heritage's name has

been observed posted on the door at the Dayton Blvd. Building, along with a listing of Defendant

Collins as one of Heritage's "management." Smith Decl. ¶ 12 & Exs. H, I. In addition, a Ford

F-150 crew cab pickup truck with the license plate number "424 RNT" has been observed at the Dayton Blvd. Building. Smith Decl. ¶¶ 9-10 & Exs. F, G. A search conducted by JVI into a database of Tennessee State motor vehicle registration records provided information indicating that Tennessee license plate number "424 RNT" is registered to Defendant Collins. Declaration of John Insogna ¶¶ 7-8 & Ex. A.

## ARGUMENT

### I. THE *EX PARTE* RELIEF REQUESTED BY FORD ON THIS MOTION IS APPROPRIATE AND WARRANTED.

Section 34 of the Lanham Act, 15 U.S.C. § 1116(d) expressly provides a statutory mechanism for *ex parte* seizure of goods and counterfeit marks involved in a violation of Section 32 of the Lanham Act, 15 U.S.C. § 1114, such as Defendants' use of counterfeits of the Ford Marks. Specifically, Section 1116(d) states that "the court may, upon ex parte application, grant an order ... providing for the seizure of goods and counterfeit marks involved in" a violation under Section 32(1)(a) that "consists of using a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services." 15 U.S.C. § 1116(d)(1)(A). As the legislative history for Section 34 indicates,

> The purpose of the ex parte seizure provision is to provide victims of trademark counterfeiting with a means of ensuring that the courts are able to exercise their jurisdiction effectively in counterfeiting cases. Testimony before both the House and Senate Judiciary Committees established that many of those who deal in counterfeits make it a practice to destroy or transfer counterfeit merchandise when a day in court is on the horizon. The ex parte seizure procedure is intended to thwart this bad faith tactic, while ensuring ample procedural protections for persons against whom such orders are issued.

*Senate-House Joint Explanatory Statement on Trademark Counterfeiting Legislation*, 130 Cong. Rec. H12076, at 12080 (Oct. 10, 1984); *see also Vuitton v. White*, 945 F.2d 569, 575 (3d Cir. 1991) (quoting same).

In addition, for many of the same reasons that Congress built an *ex parte* seizure remedy into the Lanham Act, courts have repeatedly issued *ex parte* temporary restraining orders in cases involving counterfeiters. *See, e.g., In re Vuitton et Fils S.A.*, 606 F.2d 1, 4-5 (2d Cir. 1979) ("We also believe that Vuitton has demonstrated sufficiently why notice should not be required in a case such as this one. If notice is required, that notice all too often appears to serve only to render fruitless further prosecution of the action."); *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 433 F.3d 377, 379 (6th Cir. 2006) (noting in appellate opinion district court's proper issuance of *ex parte* seizure order and temporary restraining order).

## II.    THE COURT SHOULD ISSUE THE REQUESTED ORDER TO SEIZE ANY GOODS AT DEFENDANTS' BUILDING BEARING COUNTERFEIT MARKS.

Under the Lanham Act, an *ex parte* seizure order should be issued when "the court finds that it clearly appears from specific facts" that:

(i)     an order other than an ex parte seizure order is not adequate to achieve the purposes of section 32 of this Act (15 U.S.C. 1114);

(ii)    the applicant has not publicized the requested seizure;

(iii)   the applicant is likely to succeed in showing that the person against whom seizure would be ordered used a counterfeit mark in connection with the sale, offering for sale, or distribution of goods or services;

(iv)    an immediate and irreparable injury will occur if such seizure is not ordered;

(v)     the matter to be seized will be located at the place identified in the application;

(vi)    the harm to the applicant of denying the application outweighs the harm to the legitimate interests of the person against whom seizure would be ordered of granting the application; and

(vii)   the person against whom seizure would be ordered, or persons acting in concert with such person, would destroy, move, hide, or otherwise make such matter inaccessible to the court, if the applicant were to proceed on notice to such person.

15 U.S.C. § 1116(d)(4).[1] As detailed below, Ford's application meets these requirements, and the Court should issue an *ex parte* seizure order to impound any parts in Defendants' possession at their Dayton Blvd. Building bearing any counterfeit Ford Marks.

### A.    Relief Other than *Ex Parte* Seizure is Inadequate to Protect Ford's Rights.

Based on the facts established by the Verified Complaint, and the Declarations of Jason S. Kosofsky, Ernest P. Modock, Jr., Jack Russell, Wayne H. Smith, and John Insogna, an *ex parte* seizure order is necessary to protect Ford's trademark rights. "The weight of authority around the country appears to favor the granting of ex parte seizure orders in trademark counterfeiting cases, where fake versions of well-known brands are deliberately passed off to the public as the genuine article." *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.p.A. v. Kitchen*, 548 F. Supp. 248, 249 (S.D. Fla. 1982). One district court explained as follows:

> The importance of such provisional remedies in counterfeit cases is undeniable. An important part of the final remedy in an unfair competition suit arising from the use of duplicative marks and trade dress is the destruction of the counterfeit goods. In such counterfeit cases, even when a court issues a temporary restraining order to prevent the continued sale of bogus goods, it is common for counterfeiters to simply ignore and violate the order by destroying or hiding the property in question and subsequently denying that it ever existed. Alternatively, upon learning that litigation is imminent, it is equally common for counterfeiters to transfer their inventory to another counterfeit seller whose identity is unknown to the trademark owner.

*Pepe, Ltd. v. Ocean View Factory Outlet Corp.*, 770 F. Supp. 754, 760 (D.P.R. 1991). Indeed, as the legislative history to Section 34 notes, "[i]f the mark in question is likely to be found to be counterfeit, then the applicant will ordinarily be able to show irreparable harm that the goods are likely to be distributed if their seizure is not ordered." 130 Cong. Rec. H12076 at 12081.

In this case, the Defendants' continued use of counterfeits of the Ford Marks would

---

[1] Section 34 also requires Ford to give "such notice of the application [for ex paste seizure] as is reasonable under the circumstances to the United States attorney for the judicial district in which such order is sought." 15 U.S.C. § 1116(d)(2). Ford has given written notice of this motion to the United States Attorney for the Eastern District of Tennessee.

impose significant irreparable harm to Ford. As the First Circuit has explained, "irreparable

harm flows from an unlawful trademark infringement as a matter of law." *Societe Des Produits*

*Nestle, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 640 (1st Cir. 1992). Ford has substantial

reason to expect that notice to Defendants would result in the destruction or sequestration of

goods bearing counterfeit marks and documentation and other evidence related thereto. As

detailed in the Declarations of Jason S. Kosofsky, Ernest P. Modock, Jr., and Jack Russell,

Defendants are involved in blatant infringement and counterfeiting of the Ford Marks. Over a

period of approximately six months, Defendants made at least four separate sales of parts

contained in counterfeit "FORD MOTORCRAFT" packaging to Mountain View Ford, including

fuel injector cores and assemblies. Kosofsky Decl. ¶¶ 8-17; Modock Decl. ¶¶ 6-11; Russell Decl.

¶¶ 3-8. Accordingly, Defendants' actions demonstrate that unless this Court enters an *ex parte*

seizure order, Defendants could (and likely would) dispose of or transfer to another person or

location their counterfeit goods and marks and all evidence relating to them. Leaving such

counterfeit products under the control of anyone other than the Court and/or Ford and its

representatives will irreparably harm Ford by perpetuating the risk that blatant counterfeits will

find their way into the marketplace and into the hands of consumers.

### B. Ford Has Not Publicized the Requested Seizure.

Issuance of an *ex parte* seizure order is also proper because Ford has not publicized the

requested seizure of the goods at issue. *See* 15 U.S.C. § 1116(d)(4)(B)(ii); Kosofsky Decl. ¶ 23.

In fact, Ford has quietly undertaken its investigation of this matter. *See* Kosofsky Decl. ¶¶ 8-22.

"The purpose of this ban on publicity is to prevent a plaintiff from alerting the press to an

upcoming seizure raid in an effort to create damaging publicity for the defendants." 5 J. Thomas

McCarthy, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 30:38. Of course,

publicity would be antithetical to Ford's goals, as publicity may give Defendants an opportunity to destroy or sequester the counterfeit materials to be seized.

**C.     Ford Is Likely to Succeed in Showing that Defendants Used Counterfeits of the Ford Marks.**

Ford's sworn testimony regarding Defendants' use of counterfeit marks demonstrates Ford's likelihood of success on the merits. Kosofsky Decl. ¶¶ 10-17; Modock Decl. ¶¶ 6-10. As described more fully in the Declarations of Jason S. Kosofsky and Ernest P. Modock, Jr., Ford's Global Brand Protection Group has inspected Defendants' goods and determined that they were not genuine, even though each product prominently displayed one or more of the Ford Marks. *Id* Based on Ford's detailed and careful examination of products sold by Defendants to Mountain View Ford, products bearing counterfeits of the Ford Marks, Ford has established that it is likely to succeed in showing that Defendants are using counterfeit marks in connection with the sale, offering for sale, or distribution of goods.

**D.     An Immediate and Irreparable Injury Will Occur If the Court Does Not Order the Requested Seizure.**

Issuance of the requested seizure order is necessary to avoid immediate and irreparable injury to Ford. The essence of a trademark right is the control over the nature and quality of products that bear the plaintiff's trademark. Any loss of such control results in irreparable harm to the trademark holder. Recognizing that irreparable harm necessarily results when the use of counterfeit marks is at issue, the Sixth Circuit has held as follows:

As to irreparable harm, our Circuit requires no particular finding of its likelihood to support injunctive relief in cases of this type, for "irreparable injury 'ordinarily follows when a likelihood of confusion or possible risk to reputation appears' from infringement or unfair competition."

*Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 381-82 (6th Cir. 2006) (reversing district court's denial of preliminary injunction where defendant was selling

counterfeit "NEWPORT" cigarettes) (quoting *Circuit City Stores, Inc. v. CarMax, Inc.*, 165 F.3d 1047, 1056 (6th Cir. 1999)).

The irreparable injury to Ford and its trademark rights in this case is substantial. Defendants are using counterfeits of the Ford Marks on automotive parts, including remanufactured fuel injector assemblies, and selling these parts to the consuming public without any compliance with the quality control specifications to which Ford subjects its licensees and original equipment manufacturers. Kosofsky Decl. ¶¶ 4-5, 18-19. If Defendants are allowed to continue using counterfeits of the Ford Marks in connection with the sale, offer for sale, or distribution of goods, Ford's right and ability to control the quality of products bearing its marks will be diminished. Kosofsky Decl. ¶ 19. Further, Defendants' activities jeopardize the public's entitlement to rely on the Ford Marks when making purchasing decisions. *Id.* Accordingly, Ford and the public face substantial risk of immediate and irreparable harm if a seizure is not ordered.

### E. The Goods to Be Seized Will Be Located at the Place Identified by Ford.

As set forth in the Declarations of Jason S. Kosofsky, Wayne H. Smith, and John Insogna, Ford has carried out a thorough and detailed investigation to determine the physical location(s) at which Defendants conduct their business. Kosofsky Decl. ¶¶ 20-22; Insogna Decl. ¶¶ 3-8; Smith Decl. ¶¶ 3-12. Ford's investigation revealed that, although Defendant Heritage's corporate address is listed at a residence in Soddy Daisy, Tennessee, Defendants also own and operate in a commercial building located at 6021 Dayton Boulevard, Red Bank, Tennessee, 37415. Smith Decl. ¶¶ 4-12. Ford's investigation involved visual checks of the building and premises at 6021 Dayton Boulevard on two separate visits on April 1 and 4, 2011. Smith Decl. ¶¶ 7-12. These visual checks at 6021 Dayton Boulevard revealed that Defendant Heritage is identified on a small sign on the door, and Defendant Collins is likewise listed on the sign as a member of Heritage's management. Smith Decl. ¶ 12 & Exs. H, I. Public property tax records

PENDING/PENDING/ABO-1105266_1

for Hamilton County, Tennessee also show that Defendant Heritage is the owner of the building located at 6021 Dayton Boulevard. Smith Decl. ¶ 11 & Ex. C. Finally, a truck registered to Defendant Collins was observed parked at the 6021 Dayton Boulevard address on April 1, 2011. Smith Decl. ¶¶ 8-10 & Exs. F, G; Insogna Decl. ¶¶ 5-7 & Ex. A.

Based on this investigation, the building at 6021 Dayton Boulevard, Red Bank, Tennessee, is the only non-residential, commercial building associated with Defendants and their business. Accordingly, Ford has gathered and presented evidence sufficient for the Court to find that, to the extent that Defendants are in possession of counterfeit goods of the kind at issue in this case, they will be stored and located at the 6021 Dayton Boulevard building.

### F.     The Harm to Ford Outweighs Any "Legitimate Interests" of Defendants.

The balance of hardships in this case weighs overwhelmingly in Ford's favor. As detailed above, Ford will be immediately and irreparably harmed if this Court does not issue the seizure order. A defendant who "openly" and "intentionally" appropriates a plaintiff's marks "can hardly claim to be harmed, since it brought any and all difficulties occasioned by the issuance of an injunction upon itself." *Opticians Ass'n of America v. Indep. Opticians of America*, 920 F.2d 187, 197 (3d Cir. 1990); *see also Processed Plastic v. Communications*, 675 F.2d 852, 859 (7th Cir.1982) (after a company intentionally copied a toy car, that company did not suffer hardship because it "cannot now complain that having to mend its ways would be too expensive").

In contrast to the harm that Ford would suffer from allowing Defendants to remain in possession and control of counterfeit "FORD MOTORCRAFT" parts, Defendants have absolutely no "legitimate interest" in using counterfeits of the Ford Marks that would be "harmed" by the issuance of the requested order. As the Sixth Circuit has aptly stated, "the only 'harm' that the contemplated injunction would visit on [the defendant] is hardly a legally cognizable one: It would be prohibited from selling counterfeit products, an illegal act to begin

PENDING/PENDING/ABO-1105266_1

with." *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006). Although the *Lorillard* appeal involved the weighing of interests in the context of a preliminary injunction motion, rather than a motion for *ex parte* seizure order, the reasoning expressed by the Sixth Circuit in that case nevertheless applies equally in this context. Defendants have no *legitimate* interest in continuing to possess and control counterfeit products bearing the Ford Marks, and the Court should find that the harm to Ford of allowing Defendants to continue in control of such products more than outweighs any interests of the Defendants in possessing them.

> **G.    There is Ample Reason to Believe that Defendants, Or Persons Acting In Concert With Defendants, Will Destroy, Move, or Hide Their Goods Bearing Counterfeit Marks and Related Materials If Notice Was Given.**

Finally, there is also a substantial basis for expecting Defendants to "destroy, move, hide, or otherwise make such matter inaccessible to the court." 15 U.S.C.A. § 1116(d)(4)(vii). On this issue, the courts have found it sufficient to note "that similarly situated defendants have in the past moved, hidden or destroyed counterfeit goods in an attempt to avoid seizure." 5 MCCARTHY § 30:37 at 30-32. "If there is a sufficient showing that the defendants are makers or sellers of counterfeit goods, they will not carefully preserve the evidence of their illegality." *Id.* As the Third Circuit has observed, "[c]onsistent with their calling, professional counterfeiters and dealers in counterfeit goods generally are not upstanding citizens." *Vuitton v. White*, 945 F.2d 569, 571 (3d Cir. 1991).

In the case at bar, Defendants' operation displays the hallmarks of fly-by-night counterfeiting. Here, Defendants have repeatedly sold goods to Mountain View Ford bearing counterfeits of the Ford Marks. As discussed above and in the Declaration of Jason S. Kosofsky, the counterfeit packaging used by Defendants shows obvious signs of being produced in a low-

PENDING/PENDING/ABO-1105266_1

quality manner. Kosofsky Decl. ¶¶ 11-12. Given the nature of this behavior by Defendants, the Court should reasonably conclude that, if Defendants were given notice of Ford's action prior to a seizure, the Defendants would take steps to dispose of or hide their counterfeit inventory, the means of producing such products, and records documenting their production, purchase, and sale of counterfeit goods.

### H. Ford Is Willing to Post Security, to be Determined by the Court as Adequate, in the Unlikely Event of Wrongful Seizure.

Finally, the party obtaining the *ex parte* seizure order must provide security determined adequate by the Court for payment of any damages caused by wrongful or attempted wrongful seizure of goods. 15 U.S.C. § 1116(d)(4)(A). Ford contends that bond or cash in the amount of $10,000.00 is appropriate under the circumstances of this case, but is willing to post a bond in any reasonable amount determined by the Court.

## III. THE COURT SHOULD ISSUE A TEMPORARY RESTRAINING ORDER TO PROHIBIT DEFENDANTS' FURTHER USE OF COUNTERFEIT MARKS.

Entry of a temporary restraining order ("TRO") is proper if Ford demonstrates that: (1) Ford has a strong likelihood of success on the merits; (2) Ford would suffer irreparable injury without the issuance of the requested TRO; (3) that granting the TRO would not cause substantial harm to others; and (4) that the public interest would be served by granting the TRO. *See The Great Tennessee Pizza Co. v. Bellsouth Communications, Inc.*, 2010 WL 3806145 (E.D. Tenn.) (citing *N.E. Ohio Coalition for the Homeless v. Blackwell*, 467 F.3d 999, 1099 (6th Cir. 2006)); *Leaf Funding, Inc. v. Butera*, 2006 WL 2868976 *3 (M.D. Tenn.) (citing *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000)). As discussed below, the evidence submitted with this Motion satisfies all four factors.

### A. Ford Is Highly Likely To Succeed On The Merits.

In order to succeed on the merits of its trademark infringement and counterfeiting claims,

Ford must show: (1) ownership of the Ford Marks; (2) Defendants' use of the same or similar mark(s); and (3) a likelihood that Defendants' use will cause confusion. In this case, there can be no dispute that Ford owns the Ford Marks or that Defendants have used counterfeits of the Ford Marks on Defendants' packaging.

Here, Ford has demonstrated that it is the sole owner of the Ford Marks and registrations for the same, which registrations have been deemed incontestable under the Lanham Act. 15 U.S.C. §§ 1065, 1115(b); *see* Verified Complaint ¶¶ 12-16 & Exs. A-D; Kosofsky Decl. ¶ 3. "When the right to use the mark has become incontestable, the infringement claim may be based on the registration, which is deemed conclusive evidence of the registrant's exclusive right to use the mark." *Volkswagenwerk Aktiengesellschaft v. Wheeler*, 814 F.2d 812, 820 (1st Cir. 1987). Moreover, courts have repeatedly found the FORD® mark to be highly distinctive and famous and, therefore, entitled to broad protection. *See, e.g., Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 679 (E.D. Mich. 2002) ("The Court finds that the general public recognizes the marks Ford® ... and associates those marks with Plaintiffs' automobiles. Consequently, the Court finds that Plaintiffs' marks are sufficiently famous."); *Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463, 465 (ED. Mich. 2001) ("The fact that the Ford trademark is distinctive and famous is a further permissible indicator of Defendant's bad faith.").

In any event, the last element listed above, likelihood of confusion, is the most important element in a trademark infringement and counterfeiting case such as this. "The touchstone of liability under [15 U.S.C. § 1114] is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997); *see also Ford Motor Co. v. Lloyd Design Corp.*, 184 F.Supp.2d 665, 669 (E.D. Mich. 2002).

PENDING/PENDING/ABQ-1105266_1

As the evidence discussed above establishes, Defendants are using counterfeits of the Ford Marks in connection with the sale, offer for sale, and distribution of automotive parts, which is likely to cause confusion as to the source or sponsorship of Defendants' products, thereby harming Ford. In a garden-variety trademark case, likelihood of confusion is determined by weighing various factors, including:

1. strength of the senior mark;
2. relatedness of the goods or services;
3. similarity of the marks;
4. evidence of actual confusion;
5. marketing channels used;
6. likely degree of purchaser care;
7. the intent of defendant in selecting the mark; and
8. likelihood of expansion of the product lines.

*Daddy's Junky Music Stores,* 109 F.3d at 280.

In cases such as this, involving blatant counterfeiting of a mark, the likelihood of confusion is sufficiently apparent from the use of identical marks on the same goods that the analysis is truncated. *See, e.g., Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.,* 453 F.3d 377, 381 (6th Cir. 2006) (because defendant was selling cigarettes in counterfeit packaging, "there is a certainty of confusion among consumers regarding the origin of the cigarette packages"); *see also Philip Morris USA Inc. v. Lee,* 549 F. Supp. 2d 839, 848-849 (W.D. Tex. 2008) ("In cases involving counterfeit goods, courts have consistently found a likelihood of confusion.... In these situations, a court `need only determine . . . whether the items are, in fact, counterfeit ....'" (citations omitted)); *GMC v. Autovatian Techs, Inc.,* 317 F. Supp. 2d.756, 761 (E.D. Mich. 2004) ("[S]uch multi-factored balancing is unnecessary in cases like this one where the defendant has misappropriated precise counterfeits of the plaintiff's trademarks on goods that compete with the trademark holder's own goods because `a likelihood of confusion is presumed when a defendant intentionally copies a trademark design `with the intent to derive a benefit

from the reputation of another.'" (citations omitted)); *Microsoft Corp. v. Software Wholesale Club, Inc.*, 129 F.Supp.2d 995, 1007 n.11 (S.D. Tex. 2000) ("Generally, a likelihood of confusion analysis involves a factual inquiry into several different factors.... However, in the case of a counterfeit mark, likelihood of confusion is clear."). "When counterfeit marks are involved, it is not necessary ... to determine whether a mark is a colorable imitation of a registered mark that creates a likelihood of confusion about its source, because 'counterfeit marks are inherently confusing.'" *Colgate-Palmolive Co. v..I.M.D. All-Star Imp, & Exp.*, 486 F. Supp. 2d 286, 289 (S.D.N.Y. 2007) (citations omitted).

Accordingly, based on the proof provided by Ford that Defendants are marketing and selling fuel injector cores and assemblies for use on Ford trucks in packaging that displays exact counterfeits of the Ford Marks establishes that confusion is likely, and Ford has demonstrated that it is likely to succeed on the merits of its Lanham Act claims.

**B.     Ford Will Suffer Irreparable Injury Without The Issuance Of A TRO.**

Ford has set forth indisputable evidence showing that Ford will suffer an injury that is irreparable in nature unless the Court issues an immediate TRO restraining Defendants from continuing their manufacture, marketing, and sale of parts for Ford vehicles in counterfeit packaging. This proof is discussed fully in Section II, D above, and need not be repeated here. Ford has therefore established the second requirement for issuance of a TRO.

**C.     The Grant Of A TRO Would Not Cause Harm To Others.**

In considering whether the issuance of a TRO would cause harm to "others," in a trademark counterfeiting case such as this, the "others" are Defendants. *See Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 382 (6th Cir. 2006). Accordingly, this Court needs only to consider whether the issuance of a TRO against Defendants would cause them harm. In a similar trademark counterfeiting case, the Sixth Circuit observed that a trademark

counterfeiter cannot demonstrate that injunctive relief causes it "harm," stating "the only 'harm' that the contemplated injunction would visit on [the defendant] is hardly a legally cognizable one: It would be prohibited from selling counterfeit products, an illegal act to begin with." *Lorillard Tobacco*, 453 F.3d at 382. In this case, Ford seeks a TRO that would restrain Defendants from continuing their purchase, manufacture, marketing, and sale of parts in counterfeit "FORD MOTORCRAFT" packaging. Ford also seeks an order restraining the Defendants from destroying any evidence or records relevant to the issues raised by Defendants' conduct. Given the nature of the Defendants' conduct, there can be no argument that the TRO sought by Ford would cause harm to any of Defendants' *legitimate* interests or rights.

### D.     Issuance Of A TRO Would Serve The Public Interest.

In considering the effect of a TRO on the public interest, this factor points strongly in favor of issuing TRO. The order sought by Ford "would advance two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Lorillard Tobacco*, 543 F.3d at 383.

Based on the foregoing, all factors weight in favor of the issuance of a TRO.

## IV. THE COURT SHOULD ORDER EXPEDITED DISCOVERY.

For reasons similar to those supporting the issuance of a seizure order and a TRO, the Court should order expedited discovery from Defendants. In order to obtain expedited discovery, some courts require a showing of good cause. *See, e.g., Yokohama Tire Corp. v. Dealers Tire Supply, Inc.*, 202 F.R.D. 612, 614 (D. Ariz. 2001). Other courts require a showing much like the preliminary injunction standard, namely, (i) irreparable injury; (ii) some probability of success on the merits; (iii) some connection between the expedited discovery and the avoidance of irreparable injury; and (iv) some evidence that the injury that will result without expedited discovery looms greater than the injury that the defendant will suffer if the expedited

PENDING/PENDING/ABO-1105266_1

relief is granted. *See, e.g., Crown Crafts, Inc. v. Aldrich*, 148 F.R.D. 151, 152 (E.D.N.C. 1993); *Notaro v. Koch*, 95 F.R.D. 403, 405 (S.D.N.Y. 1982). For all of the reasons articulated above, Ford easily meets such a test.

These factors overwhelmingly favor expedited discovery to prevent Defendants from concealing the evidence of their wrongdoing. In fact, expedited discovery is often granted in trademark and counterfeiting cases. *See, e.g., Sports Design & Dev., Inc. v. Schoneboom*, 871 F. Supp. 1158, 1167 (N.D. Iowa 1995); *Fimab-Finanziaria Maglificio Biellese Fratelli Fila S.P.A. v. Hello Import/Export, Inc.*, 601 F. Supp. 1, 3 (S.D. Fla. 1983). Moreover, expedited discovery is frequently granted in aid of a preliminary injunction hearing. *See, e.g., In re Websecure, Inc. Secs. Litig.*, 1997 U.S. Dist. LEXIS 19600, *13 (D. Mass. Nov. 26, 1997); *Advanced Portfolio Techs., Inc. v. Advanced Portfolio Techs., Ltd.*, 1994 J.S. Dist. LEXIS 18457, *7 (S.D.N.Y. Dec. 28, 1994).

## CONCLUSION

For all of the reasons set forth above, Ford's motion should be granted and the Court should issue an Order that, *inter alia*, Defendants' goods bearing counterfeits of the Ford Marks be seized, that the Defendants be temporarily restrained from further counterfeit activities and from moving or disposing of evidence relating to Defendants' counterfeiting and infringement, and that the Defendants be required to produce documents and things relating to their counterfeit activities on an expedited basis.

A proposed order is submitted with this Memorandum.

DATED this 25th day of April, 2011.

Respectfully submitted,

CHAMBLISS, BAHNER & STOPHEL, P.C.

Alicia Brown Oliver (BPR #018164)
Jeffrey G. Granillo (BPR #027259)
1000 Tallan Building
Two Union Square
Chattanooga, Tennessee 37402
Phone: (423) 757-0206
Facsimile: 423.508.1246
Email: aoliver@cbslawfirm.com
Email: jgranillo@cbslawfirm.com

Gregory D. Phillips
Email: gdp@hpalaw.com
Scott R. Ryther
Email: sryther@hpalaw.com
HOWARD, PHILLIPS & ANDERSEN
560 East 200 South, Suite 300
Salt Lake City, Utah 84102
Phone: (801) 366-7471

Attorneys for Plaintiff Ford Motor Company

PENDING/PENDING/ABO-1105266_1