UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

FORD MOTOR COMPANY,              )
                                )
          Plaintiff,            )
                                )        Civil Case No. 1:11-CV-92
     v.                         )
                                )        Judge Curtis L. Collier
HERITAGE MANAGEMENT GROUP,      )
INC, *et al.*,                  )
                                )
          Defendants.           )

## <u>MEMORANDUM</u>

Before the Court is Plaintiff Ford Motor Company's ("Ford") motion for summary judgment

(Court File No. 42).  Defendants Heritage Management Group, Inc. ("HMG") and Marc Collins

("Collins") responded to Plaintiff's motion (Court File No. 53), and Ford replied (Court File No. 56).

For the reasons discussed below, the Court **GRANTS** Defendants' motion for summary judgment

(Court File No. 42).    The Court **RESERVES RULING** on the amount of damages awarded and

whether this case is an "exceptional case" under 15 U.S.C. § 1117(a).  Ford is also ordered to submit

a proposed injunction fourteen days from the date of the Court's order.    The Court will announce

the date and briefing schedule of a damages hearing in a separate order.

## I.    <u>FACTUAL BACKGROUND AND PROCEDURAL HISTORY</u>

Ford Motor Company is a widely known manufacturer and distributer of motor vehicles.

Ford obtained a federal trademark associated with its automobiles and parts in 1909, and has

continued to obtain trademarks since then, including Reg. No. 74,530, one of the trademarks at issue

in this case (Court File No. 4, Comp., p. 4).  In 1986, Ford obtained a trademark registration for its

ubiquitous "Ford in Script in Oval" design mark and logo.  Also in 1986, Ford obtained Reg. No.

1,399,080 for the Ford in Script in Oval mark used on parts and components for vehicles (*id.* at p.

5). Ford has registered its Motorcraft mark, including Reg. No. 709,311 at issue in this case, for various parts and components used in its automobiles (*id.*). Additionally, Ford obtained registrations for a "Speeding Car Design" used for parts and products used in its vehicles, including Reg. No. 1,628,837. Under these and other registrations, Ford has manufactured, sold, and distributed large numbers of vehicles and parts throughout the world.

For Ford and Motrocraft parts, Ford has implemented a "Core Return Policy." This program encourages purchasers of Ford and Motorcraft parts to return the part for remanufacturing when it contains a component part, or "core" part, capable of reuse. Ford's charge for the original part contains a "core charge" which can be refunded when returned to Ford or an authorized supplier. The core is to be returned in the replacement part's packaging, which bears identifying barcodes.

Ford limits the manufacture, engineering, and distribution of parts marked with its trademarks to authorized suppliers (Court File No. 43-2, Kosofsky Decl., p. 2). Ford's packaging contains security features designed to distinguish between authorized products and unauthorized products. Ford uses a single supplier for labels bearing the Ford and Motorcraft trademarks to facilitate this process. Allegations of counterfeiting and trademark infringement are investigated by Ford's Customer Service Division through its Global Brand Protection Group (Court File No. 4, Comp., p. 6). The Brand Protection Group instructed its return location for Ford core parts to ship any parts returned by Mountain View Ford, located in Chattanooga, Tennessee, directly to the Group, where they would be investigated for counterfeit labels. Parts were then forwarded to the Group, which included a number of fuel injector assembly kits bearing labels that Investigator Jason Kosofsky identified as counterfeit. After this determination, Ford investigated the parts and

packaging of Mountain View Ford's inventory. Ford located 155 parts in packaging bearing counterfeit labels. These parts were sold to Mountain View Ford by Defendant HMG between July 2010 and January 2011.

After discovering the counterfeit packaging and labels, Ford sought an *ex parte* seizure order from the Court, which was granted (Court File No. 11). Ford executed this order at Collins' residence and at the building in Red Bank, Tennessee where HMG conducts its business. At the Red Bank building, Ford seized a number of items including counterfeit packaging, labels, truck parts, and Defendants' means of producing counterfeit labels. Ford filed with the Court an inventory of the parts and products seized (Court File No. 20). Additionally, Investigator Kosofsky selected a handful of examples from the inventory and determined they were counterfeit (Court File No. 43-7, Kosofsky Decl. II). These included counterfeit packaging and labels. Additionally, Ford located counterfeit "Core Deposit" labels, used by customers to return core parts to Ford for reimbursement.

Pursuant to the *ex parte* seizure order, Defendants served a sworn statement on Ford describing their business (Court File No. 43-8, Ex. A, Defs. Stmt.). In the statement, Defendants admitted to purchasing parts on eBay, although they were unsure where the parts came from or where they were produced before they arrived in their possession. Defendants admit they produced packaging and labels meant to resemble Ford's own, but claim they did this solely to avoid confusion for its customers, which were primarily car dealerships. Defendants maintain that, to their knowledge, HMG never sold a product in Ford packaging or Ford-like packaging that was not a genuine Ford product. However, Investigator Kosofsky examined the spreadsheets and names associated with Defendants' suppliers, and determined most of the parts were not purchased from a Ford authorized supplier of genuine new or remanufactured parts.

3

Ford filed a complaint alleging trademark infringement, false designation of origin, and trademark dilution (Court File No. 4). The parties agree on nearly all of the facts detailed above. The only point of disagreement between the parties is whether HMG ever sold a non-genuine Ford part in its counterfeit packaging or labels. Defendants assert, based on Collins' affidavit, that he inspected each part and determined whether it was a genuine Ford product before he resold the part. Ford, on the other hand, claims the parts sold by HMG were not purchased through Ford's supply chain and are accordingly not genuine Ford parts.

## II.  **STANDARD OF REVIEW**

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Leary v. Daeschner*, 349 F.3d 888, 897 (6th Cir. 2003). The Court views the evidence, including all reasonable inferences, in the light most favorable to the non-movant. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574 (1986); *Nat'l Satellite Sports, Inc. v. Eliadis, Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). However, the non-movant is not entitled to a trial based merely on its allegations; it must submit significant probative evidence to support its claims. *See Celotex*, 477 U.S. at 324; *McLean v. Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). Should the non-movant fail to provide evidence to support an essential element of its case, the movant can meet its burden of demonstrating no genuine issue of material fact exists by pointing out such failure to the court. *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989).

At summary judgment, the Court's role is limited to determining whether the case contains

sufficient evidence from which a jury could reasonably find for the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). If the Court concludes a fair-minded jury could not return a verdict in favor of the non-movant based on the record, the Court should enter summary judgment. *Id.* at 251-52; *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994).

## III.   DISCUSSION

Ford's complaint alleges Defendants are liable under the Lanham Act for trademark infringement and counterfeiting, 15 U.S.C. § 1114, false designation of origin under 15 U.S.C. § 1125(a), and Trademark Dilution under 15 U.S.C. § 1125(c).

### A. Trademark Infringement and Counterfeiting

#### 1. Likelihood of Confusion

A claim of trademark infringement under the Lanham Act, 15 U.S.C. § 1114, requires a plaintiff to show "(1) that it owns a valid, protectable trademark; (2) that the defendant used the mark in commerce and without the registrant's consent; and (3) there was a likelihood of consumer confusion." *Abercrombie & Fitch v. Fashion Shops of Kentucky, Inc.*, 363 F. Supp. 2d 952, 957 (S.D. Ohio 2005). Further, if a plaintiff establishes infringement and additionally alleges trademark counterfeiting, he must also show that "the defendant intentionally used the mark knowing it was a counterfeit, as the term counterfeit is defined in 15 U.S.C. § 1116." *Id.* at 957-58. Section 1116 defines counterfeit mark as "a mark that is registered on the principal register in the United States Patent and Trademark Office for such goods or services sold, offered for sale, or distributed and that is in use, whether or not the person against whom relief is sought knew such mark was so registered." "Elsewhere, the statute provides additional clarification, defining 'counterfeit' as 'a spurious mark which is identical with, or substantially indistinguishable from, a registered mark.'"

*Laukus v. Rio Brands, Inc.*, 391 F. App'x 416, 425 (6th Cir. 2010) (quoting 15 U.S.C. § 1127).

The first two elements of trademark infringement are undisputed in this case. Defendants do not contest the validity of Ford's trademarks and the Court finds Ford's trademarks are indeed valid and protectable. *See Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 679 (E.D. Mich. 2002); *Ford Motor Co. v. Lapertosa*, 126 F. Supp. 2d 463, 465 (E.D. Mich. 2001). With respect to the second element, "commerce" means "all commerce which may lawfully be regulated by Congress." 15 U.S.C. § 1127. Defendants admit to selling automobile parts in packaging bearing Ford's trademark (Court File No. 53, Defs. Resp., p. 2) ("Defendants agree with Plaintiff that they had to, under certain circumstances when it became necessary repackage the parts (fuel injectors) for identification purposes, to preserve the identification, quality and character of the part."). Defendants even admit to repackaging automobile parts with labels created to look identical to Ford's genuine labels (*id.* at 5) ("Ford also states that the Defendants had no other reason to make such labels but to make the packaging appear genuine. They were used for just that. And in fact, they were identical labels.") (citation omitted). Defendants also admit to using the Internet in furtherance of its business, which is "an instrumentality of interstate commerce." *Utah Lighthouse Ministry v. Found. for Apologetic Info. & Research*, 527 F.3d 1045 (10th Cir. 2008) ("We agree that the Internet is generally an instrumentality of interstate commerce, and thus that the jurisdiction of the Lanham Act constitutionally extends to unauthorized uses of trademarks on the Internet."). Moreover, when a defendant uses an infringing mark in the same geographic location where the plaintiff uses a registered mark, the "in commerce" requirement is satisfied. *World Carpets, Inc. v. Dick Littrell's New World Carpets*, 438 F.2d 482, 488-89 (5th Cir. 1971) ("Since as a matter of Constitutional law it is now beyond question that Congress may regulate intrastate activities which

6

substantially affect interstate commerce, it is clear that intrastate infringing use is within the provisions of the Act if it has a substantial economic effect upon interstate use by the mark's owner.") (citation omitted).

As to the third element, "[t]he touchstone of liability under § 1114 is whether the defendant's use of the disputed mark is likely to cause confusion among consumers regarding the origin of the goods offered by the parties." *Daddy's Junky Music Stores, Inc. v. Big Daddy's Family Music Center*, 109 F.3d 275, 280 (6th Cir. 1997). Courts consider the following eight factors when determining whether the mark is likely to cause confusion: "(1) strength of the plaintiff's mark; (2) relatedness of the goods or services; (3) similarity of the marks; (4) evidence of actual confusion; (5) marketing channels used; (6) likely degree of purchaser care; (7) intent of the defendant in selecting the mark; and (8) likelihood of expansion of the product lines." *Abercrombie*, 363 F. Supp. 2d at 959 (citing *Frisch's Rests, Inc. v. Elby's Big Boy of Steubenville, Inc.*, 670 F.2d 642 (6th Cir. 1982)). However, "such multi-factored balancing is unnecessary in cases like this one where the defendant has misappropriated precise counterfeits of the plaintiff's trademarks on goods that compete with the trademark holder's own goods." *General Motors Corp. v. Autovation Technologies, Inc.*, 317 F. Supp. 2d 756, 761 (E.D. Mich. 2004). In such cases, "a likelihood of confusion is presumed when a defendant intentionally copies a trademark design 'with the intent to derive a benefit from the reputation of another.'" *Id.* (quoting *Ford Motor Corp. v. Lloyd*, 22 F. App'x 464, 467 (6th Cir. 2001)).

Defendants argue, because they only sold genuine Ford parts and their imitation packaging and labels appeared authentic, there could be no "confusion" among consumers (Court File No. 53, Defs. Resp. p. 7-8) ("The fuel injectors sold by [Defendants] were already packaged or were

7

repackaged to prevent confusion or deceit. . . . The plaintiff itself has made issue with the fact they allege that almost identical labels were placed on the boxes."). Because Defendants admit they intentionally produced precise counterfeits of the trademarks on goods they sold to Ford dealerships, the Court finds likelihood of confusion is presumed and that it does not need to engage in the multi-factor analysis. Additionally, counterfeiting is established because Defendants admit to creating nearly identical labels bearing Ford's registered mark. *See Laukus*, 391 F. App'x at 425 (finding use of a protected mark is a prima facie counterfeit trademark claim).

Even if the Court were to engage in the multi-factor analysis, likelihood of confusion would clearly be established. *See General Motors Corp.*, 317 F. Supp. 2d at 761-63 (engaging in the eight factor test after finding a presumption of likelihood of confusion).

(1) <u>Strength of mark.</u> Ford's marks are known worldwide and are strong. The strength of Ford's mark is the most likely reason Defendants would imitate it. *Ford Motor Co. v. Lloyd Design Corp.*, 184 F. Supp. 2d 665, 669-70 (E.D. Mich. 2002) (finding Ford's trademarks are strong and that the defendant's intentional copying of the trademarks "is strong evidence of their secondary meaning").

(2) <u>Relatedness of the goods.</u> Not only are the goods in this case related, Defendants' argument rests entirely on the contention they sold *actual* Ford products.

(3) <u>Similarity of the marks</u>. Similarly, Defendants' likelihood of confusion argument also rests on how similar, indeed identical, its counterfeit labels were.

(4) <u>Evidence of actual confusion.</u> Although Ford has offered no evidence of actual confusion, "lack of such evidence is rarely significant." *Id.* (quoting *Daddy's Junky Music Stores*, 109 F.3d at 284).

8

(5)     Marketing channels used. Defendants marketed the parts to Ford's authorized

        dealerships.  This factor weighs in favor of finding a likelihood of confusion. *See id.*

        at 671-72 ("Defendant admits to having marketed its mats via Plaintiffs' authorized

        dealerships.").

(6)     Degree of purchaser care. Ford stresses that the purchasers in this case are the

        downstream car owners who will be unable to distinguish between Ford's authorized

        parts and Defendants'.  However, the Court concludes the purchasers in this case are

        the dealerships.  Because "[a] higher likelihood of care is expected when prospective

        purchasers have relevant expertise or sophistication, or when the goods are expensive

        or unusual," *id.* at 672 (quoting *Daddy's Junky Music Stores*, 109 F.3d at 285), this

        factor does not weigh in favor of finding a likelihood of confusion.

(7)     Defendants' intent. As noted above, "a likelihood of confusion is presumed when a

        defendant intentionally copies a trademark design 'with the intent to derive a benefit

        from the reputation of another.'" *General Motors Corp.*, 317 F. Supp. 2d at 761.

        Because Defendants admit they intentionally copied the trademark design in

        repackaging the parts, this factor weighs in favor of finding a likelihood of

        confusion.

(8)     Likelihood of expansion of the product lines. Because the parties are in competition,

        this factor must be weighed in Ford's favor.  *See id.* at 763 ("In this case, the parties

        are already in direct competition in the same market. Accordingly, this factor must

        be weighed heavily in favor of [Plaintiff].").

"[T]hese factors are a guide and [] they need not be analyzed with mathematical precision. . . . '[a]

9

party claiming infringement need not show all, or even most, of these factors in order to prevail.'" *Ford Motor Co.*, 184 F. Supp. 2d at 669 (quoting *Esercizio v. Roberts*, 944 F.2d 1235, 1242 (6th Cir. 1991)). Because most of the factors weigh in favor of finding a likelihood of confusion, and Defendants admit they intended to copy Ford's mark, the Court finds a likelihood of confusion also exists under the multi-factor test.

Defendants do not focus their argument on these factors or on the likelihood of confusion. Rather, Defendants focus their argument on whether the parts they sold were "genuine." *See Abercrombie*, 363 F. Supp. 2d at 959 ("[M]any courts, including this Court, have treated genuiness as a threshold question."). In support of this contention, Defendants rely solely on an affidavit by Defendant Collins, which states he inspected every item to determine if it was a genuine Ford part and only repackaged and sold those parts he concluded were in fact produced by Ford (Court File No. 53-1, Collins Aff.). Collins claims he has been employed by Ford "in the Parts and Service capacity" since 1973 (Court File No. 53-1, Collins Aff.). This extensive experience "gives [him] the ability and expertise to inspect and identify Ford parts and products, including diesel fuel injectors." After receiving parts, Collins claims he "identified all [the] parts . . . as Original Equipment Manufactured parts, including all parts that have previously been sold to Ford Dealerships, as well as those confiscated by Ford during their seizure." He states that the fuel injectors at issue do not bear Ford marks, but instead are identified by Navistar part numbers and have Siemens stamped on them. Defendants conclude this is sufficient evidence they sold genuine Ford parts to withstand summary judgment.

Defendants cite *Prestonettes, Inc. v. Coty*, 264 U.S. 359 (1924), for the proposition repackaging genuine goods does not constitute trademark infringement. In *Coty*, the plaintiff, Coty,

alleged the defendant, Prestonettes, had infringed its trademark by selling its genuine products in a repackaged form. Prestonettes purchased powder from Coty, applied pressure to it, added a binder, and sold it in a metal case. Prestonettes also sold Coty's perfume in smaller bottles. The Court of Appeals concluded, due to the sensitive nature of the product, too high a risk of adulteration was posed and issued an injunction against the use of Coty's marks except on original packaging. *Id.* at 367. The Supreme Court reversed, reinstituting the district court's decree that allowed Prestonettes to sell Coty's repackaged product as long as it disclosed to consumers the product was repackaged. The Court concluded that "[w]hen the mark is used in a way that does not deceive the public" it does not constitute infringement. *Id.* at 368. After all, "[i]f defendant's rebottling the plaintiff's perfume deteriorates it and the public is adequately informed who does the bottling," the public would be unlikely to blame Coty for that deterioration. *Id.* at 369.

### 2. First Sale Doctrine

Although not explicitly stated in their brief, Defendants rely on the "first sale" or "exhaustion" doctrine, which provides a "resale by the first purchaser of the original trademarked item is generally neither trademark infringement nor unfair competition." *Brilliance Audio, Inc. v. Haights Cross Communications, Inc.*, 474 F.3d 365, 369 (6th Cir. 2007) (citing *Coty*, 264 U.S. at 368-69). This rule is based on the premise that "'trademark law is designed to prevent sellers from confusing or deceiving consumers about the origin or make of a product, which confusion ordinarily does not exist when a genuine article bearing a true mark is sold.'" *Id.* (quoting *NEC Elecs. v. CAL Circuit Abco*, 810 F.2d 1506, 1509 (9th Cir.1987)).

However, when an item has been repackaged, the first sale exception does not apply "when the notice that the item has been repackaged is inadequate." *Brilliance Audio*, 474 F.3d at 369 (citing

11

*Enesco Corp. v. Price/Costco Inc.*, 146 F.3d 1083 (9th Cir. 1998)). The court in *Enesco* considered

the first sale exception as described in *Coty*. Enesco markets small, porcelain figurines under the

"Precious Moments" trademark. Without being properly packaged, Enesco claimed the figurines

were susceptible to breaking or chipping. Enesco's policy was to sell its figurines only to stores

willing to offer display space and provide personal services to customers. Costco, with which

Enesco was unaffiliated, began selling the figurines in its own packaging. Costco would remove the

figurines from Enesco's packaging and place it in its own clear package. Enesco sued Costco under

the Lanham Act. When Costco moved to dismiss under the first sale doctrine, the district court

granted Costco's motion without opinion. On appeal, the Ninth Circuit reversed. Considering the

analysis in *Coty*, the court concluded Enesco was entitled to an injunction prohibiting the sale of

figurines without a repackaging notice.[1] Such an injunction "would be necessary to protect the

public confusion about Price/Costco's involvement." *Id.* at 1086.

Here, of course, no notice was so provided. Defendants admit their packaging and labels

were nearly indistinguishable from Ford's genuine labels. Defendants explain this is necessary to

avoid confusion among dealer-customers (Court File No. 53, Defs. Resp., p. 7) ("[T]he quality of

the labels was for the Ford Dealerships' benefit, for the identification of parts."); (*id.* at p. 10)

("[T]he labels on the boxes containing the plaintiff's parts indicate that it was plaintiff that

manufactured or distributed the parts. If the defendants had sold the parts without the label marks,

_____

[1] "[T]he label, if it is to use the trademark of the original manufacturer, must clearly state: (1) that the trademarked product has been ... repacked; (2) that the ... repacker is wholly separate and distinct from the original manufacturer; (3) the name of the ... repacker. A fourth requirement is that the label not emphasize the original manufacturer's trademark by putting it in larger type, different color or size, etc." *Enesco*, 146 F.3d at 1086 n.4 (quoting 3 J. Thomas McCarthy, McCarthy on Trademarks and Unfair Competition § 25:35 (4th ed.1996)).

12

[customers would have been confused].").  Accordingly, Defendants are not entitled to rely on the first sale doctrine.

### 3. Genuineness

Ford also argues the goods sold are not "genuine" because they were not subject to Ford's quality control standards. Although not cited in its brief, Ford's theory resembles the holding in *El Greco Leather Products, Co v. Shoe World, Inc.*, 806 F.2d 392, 395 (2d Cir 1986). *El Greco* offered a broad view of "genuineness," stating that because "[o]ne of the most valuable and important protections afforded by the Lanham Act is the right to control the quality of the goods manufactured and sold under the holders trademark. . . . the actual quality of goods is irrelevant; it is the control of quality that a trademark holder is entitled to maintain."  The court held, because the trademark holder required quality inspections before distribution and those inspections were not performed by the defendant, the goods were not "genuine" under the Lanham Act. *Id.* at 396.  The Second Circuit has cautioned that *El Greco* does not alter the first sale doctrine.  *H.L. Hayden Co. of New York v. Siemens Medical Systems, Inc.*, 879 F.2d 1005, 1023 (2d Cir. 1989).  Although the Sixth Circuit has not considered *El Greco*, many district courts within the Sixth Circuit have applied its broad view of genuineness.  *See Abercrombie*, 363 F. Supp. 2d at 959-60 (citing cases).[2]

To show infringement by depriving a trademark holder of its right to control the quality of its goods, the holder must show "that (i) the asserted quality control procedures are established, legitimate, substantial, and nonpretextual, (ii) it abides by these procedures, and (iii) sales of products that fail to conform to these procedures will diminish the value of the mark." *Zino Davidoff*

---

[2] These cases generally involve instances of legitimately manufactured goods that have not been authorized for sale, as was the case in *El Greco*. *See, e.g.*, *Too, Inc. v. TJX Companies, Inc.*, 229 F. Supp. 2d 825 (S.D. Ohio 2002).

13

*SA v. CVS Corp.*, 571 F.3d 238, 244 (2d Cir. 2009) (citing *Warner-Lambert Co. v. Northside Dev. Corp.*, 86 F.3d 3 (2d Cir. 1996)). "[T]he trademark holder's claim is not defeated because of failure to show that the goods sold were defective. That is because the interference with the trademark holder's legitimate steps to control quality unreasonably subjects the trademark holder to the risk of injury to the reputation of its mark." *Id.*

Courts have struggled with the line between legitimate, unauthorized secondary sales and sales that constitute trademark infringement by interfering with a trademark holder's quality control standards. *See Abercrombie*, 363 F. Supp. 2d at 961.

> The legal situation is a distributor's resale of unchanged trademarked goods under the "first sale" or "exhaustion" rule, free from the control of the brand owner. The infringing situation is where the trademark owner is entitled to exercise control over the distribution, handling and sale of the trademarked product, such that sale of trademarked products without such quality control is an infringement.

*Id.* (quoting 4 McCarthy on Trademarks and Unfair Competition § 25:42 (4th ed.)). The Sixth Circuit has stated "the first sale doctrine applies when a purchaser 'does no more than stock, display, and resell a producer's product under the producer's trademark.'" *PACCAR Inv. v. TeleScan Technologies, LLC*, 319 F.3d 243, 257 (6th Cir. 2003), *abrogated on other grounds by KP Permanent Make-Up, Inc. v. Lasting Impression I, Inc., et al.*, 543 U.S. 111 (2004). However, "the first sale doctrine offers no defense when 'the reseller used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees.'" *Id.* (quoting *Sebastian Int'l, Inc. v. Longs Drug Stores Corp.*, 53 F.3d 1073, 1076 (9th Cir.1995)).

The Court finds sufficient grounds to conclude Defendants interfered with Ford's quality control standards. Ford has offered undisputed evidence they maintain quality control standards

14

implemented through approved manufacturers and distributers for both new and remanufactured goods. The Court thus considers it established that Ford's procedures are legitimate and that it abides by them. Defendants admit they are unaware of the sources of the Ford products they sold, although they speculate some of those goods likely came from Ford dealerships "selling their parts under names not related to the dealerships" (Court File No. 53, Defs. Resp., p. 6); *see also* (Court File No. 43-8, Ex. A, Defs. Stmt.) ("HMG is unable to confirm where the parts it acquired were stored prior to being purchased by HMG."). Ford need not demonstrate the goods were actually defective, but only that they created a risk of injury to its reputation because they were sold without being subject to Ford's quality control procedures. *See Zino Davidoff*, 571 F.3d at 244. Even construing the evidence in a light most favorable to Defendants, the Court concludes Defendants' repackaging of goods they can only speculate are produced by Ford and purchased within Ford's supply chain poses a "risk of injury to the reputation of [Ford's] mark." *Id.*; *see also Green v. Electric Vacuum Cleaner Co.*, 132 F.2d 312, 314 (6th Cir. 1942) (holding a patent infringer does not meet his burden to establish an implied license under the first sale doctrine by merely asserting "that the articles are legitimate and, without disclosing their source, were purchased from those who bought from the plaintiff"). This is true even assuming Collins can effectively identify and inspect Ford products, because the right to establish quality standards belongs to the mark holder, *see El Greco*, 806 F.2d at 395, and Collins may not circumvent those standards regardless of his qualifications. Accordingly, the Court holds Defendants infringed Ford's trademark by repackaging and selling parts under its mark that were not subject to Ford's quality control standards.

It is clear to the Court that Defendants would be fully within the confines of the law to resell unused new or remanufactured Ford products in their original packaging. Such a sale is easily

categorized as acceptable under the first sale doctrine. Further, Defendants could sell repackaged Ford products as long as there was both a notice of repackaging, as discussed in the previous section, and a disclaimer that Defendants are unaffiliated with Ford. *See H.L. Hayden*, 879 F.2d at 1024 (citing with approval a district court case requiring such a disclaimer). Here, however, Defendants produced packaging and labels intended to deceive customers into believing the products were sold in Ford's supply chain. That is, the labels produced by Defendants, and the packaging indistinguishable from Ford's own, created a risk customers would believe the parts came from Ford or an authorized distributer. If the parts were substandard or of otherwise reduced quality, consumers' opinion of Ford's mark would be adversely affected. Such impairment of Ford's mark is precisely the harm the Lanham Act is designed to remedy. *See Zino Davidoff*, 571 F.3d at 243-44 ("In attaching its mark to its goods over time, a holder assures consumers that the goods conform to the mark holder's quality standards. Reputation for quality, whether good or bad, becomes associated with a mark in the minds of consumers. Many consumers are willing to pay more to buy goods bearing a mark which experience has taught the consumer represents an assurance of high quality."); *see also PACCAR Inv.*, 319 F.3d at 257 ("[T]he first sale doctrine offers no defense when 'the reseller used the trademark in a manner likely to cause the public to believe the reseller was part of the producer's authorized sales force or one of its franchisees.'").

Ford would have the Court take an additional step and apply the reasoning of *Monsanto Co. v. Haskel Trading, Inc.*, 13 F. Supp. 2d 349, 356-57 (E.D.N.Y. 1998). In *Monsanto*, the court faced an issue similar to the issue at hand. Monsanto manufactured and distributed artificial sweetener under "NutraSweet" and "Equal" trademarks. Haskel began repackaging Monsanto's sweetener, which was distributed in institutional-size cartons containing a large number of smaller packets, into

16

retail sized boxes for individual customers. The smaller boxes Haskel produced were "similar in all material respects" to the retail-sized boxes actually produced by Monsanto and did not disclose they repackaged the sweetener. The court concluded Haskel created a likelihood of confusion as to the product's source. It was necessary for the court to determine "whether the 'product' distributed by the plaintiffs consists solely of loose packets of sweetener or whether that 'product' also includes the institutional and retail size boxes which the plaintiffs use to distribute those packets." *Id.* at 357. The court considered the purposes of the box, including the "Lot Code" that allowed Monsanto to track the manufacture and packing of its product and would expedite recalls if a safety problem arose concerning the sweetener. The box is also necessary to inform consumers of the number of sweeteners contained in the boxes and to serve as containers, which is important to the product's image. The court further concluded the quality of the boxes was also important, because boxes using toxic glue, for example, would diminish the public's appetite for the product. The court, relying on these findings, concluded Haskel created a likelihood of confusion as to the source of part of the product, in that case, the box. *Id.*

In considering the impact of *El Greco*, the *Monsanto* court noted that the Second Circuit described its *El Greco* holding as one about quality control. However, the *Monsanto* court found support for its holding in *El Greco*'s reasoning. Although *El Greco* could be viewed as a holding about quality, it "might better be described as one regarding likelihood of confusion as to source: until the certificate of inspection was issued, the shoes were not truly the 'product' of El Greco, and any consumer purchasing the defendants' shoes might therefore be confused as to the source of those shoes." *Monsanto*, 13 F. Supp. 2d at 357 n.5 (citing *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 816 F.2d 68 (2d Cir. 1987)). This reading clarifies *El Greco*'s admonition the

quality of the product is irrelevant, which conflicts with the usual showing required in confusion of quality cases, that the defendant's illegitimate sales diminish the value of a plaintiff's trademark. *Id.* at 355 (citing *Warner-Lambert Co. v. Northside Development Corp.*, 86 F.3d 3 (2d Cir. 1996)).

Ford points to similarities between *Monsanto* and the instant case, notably Ford's reliance on its packaging and labels to track its products, ensure their quality, and execute its "core" program. However, the Court finds good reason not to follow the *Monsanto* court by finding the boxes in this case were part of Ford's products. *Monsanto* dealt with a situation closer to the "unauthorized" product cases that have applied the *El Greco* reasoning. In those cases, a manufacturer produces genuine goods for a trademark holder but the goods are not authorized for sale. The manufacturer then sells the goods under the trademark. Cases facing this situation have considered the *El Greco* genuineness reasoning. *See, e.g.*, *Abercrombie*, 363 F. Supp. 2d at 959-60, *Too, Inc.*, 229 F. Supp. 2d at 832. *Monsanto* involved a different but similar situation. There, the defendant bought one good, the institutional-size boxes, and repackaged it into a separate good, the retail-size boxes, which the trademark holder did not authorize it to produce. Here, on the other hand, only one good exists. Defendants were not producing a separate Ford good it was unauthorized to produce, but were repackaging an allegedly genuine good with an imitation of its original packaging. The Court believes this issue is fundamental to the *Monsanto* case. Accordingly, a finding the boxes in this case were a "part" of the good itself would be inappropriate.

Although the Court declines to extend the power of Ford's trademark to its packaging, Defendants' failure to place notice on its counterfeit packaging and labels notifying customers that the goods were repackaged is sufficient for a judgment in Ford's favor. Further, Defendants violated Ford's trademark by interfering with the implementation of Ford's quality control standards. The

Court **GRANTS** Ford's motion for summary judgment on its trademark infringement and counterfeiting claim.

### B. False Designation of Origin

Ford claims Defendants violated another portion of the Lanham Act, 15 U.S.C. § 1125(a), which imposes liability on "[a]ny person who, on or in connection with any goods or services . . . uses in commerce . . . any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which . . . is likely to cause confusion, or to cause mistake, or to deceive . . . as to the origin . . . of his or her goods, services, or commercial activities." To make a claim of false designation of origin, a plaintiff must establish "(1) the false designation [] ha[d] a substantial economic effect on interstate commerce; and (2) the false designation [] create[d] a likelihood of confusion." *Johnson v. Jones*, 149 F.3d 494, 502 (6th Cir. 1998). This is "the same test" used to decide if there has been trademark infringement. *Audi AG v. D'Amato*, 469 F.3d 534, 542 (6th Cir. 2006). Accordingly, for the same reasons the Court finds Defendants engaged in trademark infringement, the Court concludes Ford has established its claim of false designation of origin and **GRANTS** its motion for summary judgment. *See Champions Golf Club, Inc. v. The Champions Golf Club, Inc.*, 78 F.3d 1111, 1123 (6th Cir. 1996) ("'[T]he same factors are considered under section 1125(a) as are considered under section 1114.' In its reexamination of those eight factors in connection with Houston's mark infringement claim, the district court will, necessarily, reexamine its conclusion with respect to Houston's unfair competition claim, reaching the same conclusion with respect to both.") (citation omitted); *Wynn Oil Co. v. American Way Service Corp.*, 943 F.2d 595, 604 (6th Cir. 1991) ("Defendants concede that likelihood of confusion is the essence of an unfair competition claim and that the same factors are considered under section 1125(a) as are

considered under section 1114. Even the standard of appellate review is the same. Thus, as we hold that the district court was correct in finding trademark infringement, we also hold that the district court correctly found that defendants engaged in unfair competition under section 1125(a).") (citations omitted).

### C. Trademark Dilution

Ford also claims Defendants diluted its trademark as prohibited in 15 U.S.C. § 1125(c). In order to establish trademark dilution, Ford must show "that its trademark is (1) famous and (2) distinctive, and that [Defendants'] use of the mark (3) was in commerce, (4) began after [Ford's] mark became famous, and (5) 'cause[d] dilution of the distinctive quality' of [Ford's] mark." *Audi AG*, 469 F.3d at 547.

Ford easily satisfies the first two factors. *See id.* ("It is clear from the record that Audi's trademarks, on which Audi has spent millions of dollars and which are known worldwide, satisfy the first two factors."). For reasons discussed in the Courts discussion of the elements of trademark infringement, Defendants' use of the mark was "in commerce." *Supra* § 3.A.1. Defendants admit they began using the mark in 2009, well after Ford's mark became famous (Court File No. 43-8, Ex. A, Defs. Stmt.). Thus the chief question on this claim is whether Defendants caused "dilution of the distinctive quality' of Ford's mark." However, with respect to this factor "the Supreme Court has noted that 'direct evidence of dilution such as consumer surveys will not be necessary if actual dilution can reliably be proven through circumstantial evidence—the obvious case is one where the junior and senior marks are identical.'" *Audi AG*, 469 F.3d at 547 (quoting *Moseley v. V. Secret Catalogue*, 537 U.S. 418, 434 (2003)). Defendants admit the marks in this case were identical, and indeed intended to be indistinguishable. Accordingly, Ford has established trademark dilution, and

its motion for summary judgment is **GRANTED**.

### D. Remedies

#### 1. Damages

Under the Lanham Act, 15 U.S.C. § 1117, a successful plaintiff may recover actual damages or statutory damages, if the plaintiff selects statutory damages "at any time before final judgment is rendered by the trial court." Actual damages entitle a plaintiff "to recover (1) defendant's profits, (2) any damages sustained by plaintiff, and (3) the costs of the action." § 1117(a). Where, as here, a case involves a counterfeit mark, the Court shall enter judgment for three times the profits or damages, whichever is greater, and a reasonable attorney's fee if the use of the mark was intentional, the defendant knew the mark was counterfeit, and the defendant used the mark in connection with a sale, offering for sale, or distribution of goods or services. § 1117(b). However, before the Court enters final judgment, Ford may select statutory damages in this case. The amount of such damages varies from $1,000 to $200,000 per counterfeit mark, or not more than $2,000,000 per mark if the use of the counterfeit mark was willful. § 1117(c).

The Court will **RESERVE RULING** on damages. Ford selected the actual damages remedy in its complaint, and argued for statutory damages in the alternative. However, the summary judgment briefing contained insufficient proof of Defendants' profits and Ford's damages. The Court will hold a damages hearing, before which both parties will submit briefing on the appropriate damage award.

#### 2. "Exceptional Case"

Ford also seeks a ruling from the Court that this case constitutes an "exceptional case" under § 1117(a) and Ford is therefore entitled to attorney's fees. However, because the damage award is

21

left unresolved, the Court's decision today is not a "final judgment," *Liberty Mut. Ins. Co. v. Wetzel*, 424 U.S. 737, 744 (1976), and Ford may still select statutory damages. If Ford does select such damages, the Court would not be required to entertain this argument. Accordingly, the Court **RESERVES RULING** on this issue.

### 3. Permanent Injunction

Ford seeks a permanent injunction against Defendants. A court may grant such an injunction under the Lanham Act "according to the principles of equity and upon such terms as the court may deem reasonable." *Lorillard Tobacco Co. v. Hamden, Inc.*, No. 5:10-CV-1886, 2011 WL 5024883, at *7-8 (N.D. Ohio Oct. 21, 2011) (quoting 15 U.S.C. § 1116(a)). "A plaintiff seeking a permanent injunction must demonstrate that [1] it has suffered irreparable injury, [2] there is no adequate remedy at law, [3] 'that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted,' and [4] that it is in the public's interest to issue the injunction" *Audi AG*, 469 F.3d at 550 (quoting *eBay Inc., et al. v. MercExchange, LLC*, 547 U.S. 388 (2006)).

First, "irreparable injury may be inferred 'when there is a likelihood of confusion or possible risk to [the Plaintiff's] reputation.'" *Lorillard Tobacco*, 2011 WL 5024883, at *8 (quoting *Wynn Oil Co.*, 943 F.2d at 608). The Court has already determined Ford proved a likelihood of confusion in this case, and as such irreparable injury is also established. Second, "where there is potential for future harm from infringement, there is no adequate remedy at law." *Microsoft Corp. v. McGee*, 490 F. Supp. 2d 874, 882 (S.D. Ohio 2007) (citing *Audi AG*, 469 F.3d at 550)). Defendants in this case maintain a large portion of their business entails selling non-infringing Ford parts to customers (Court File No. 43-8, Ex. A, Defs. Stmt.). Presumably, Defendants will continue its legitimate business activity. Because Defendants will be in a position to maintain their relationship with Ford's

22

customers, a potential for future harm is present and the best way to ensure Defendants refrain from future infringement is through equitable relief. *See Lorillard Tobacco*, 2011 WL 5024883, at *8 ("[E]quitable relief is the best way to prevent further consumer confusion between authentic and counterfeit cigarettes."). Third, there is no harm to Defendants "because an injunction will only require Defendant[s] to comply with the Lanham Act." *Id.*; *see also Audi AG*, 469 F.3d at 550 ("In balancing the hardships between each party, we note that D'Amato faces no hardship in refraining from willful trademark infringement, whereas Audi faces hardship from loss of sales."). Finally, enjoining Defendants against violating the Lanham Act serves "two fundamental purposes of trademark law: preventing consumer confusion and deception in the marketplace and protecting the trademark holder's property interest in the mark." *Microsoft Corp.*, 490 F. Supp. 2d at 883 (quoting *Lorillard Tobacco Co. v. Amouri's Grand Foods, Inc.*, 453 F.3d 377, 383 (6th Cir. 2006)).

Accordingly, the Court finds Ford is entitled to a permanent injunction. Ford is ordered to submit a proposed injunction fourteen days from the date of the Court's order.

## IV.    CONCLUSION

For the foregoing reasons, the Court **GRANTS** Ford's motion for summary judgment (Court File No. 42). The Court **RESERVES RULING** on the amount of damages awarded and whether this case is an "exceptional case" under 15 U.S.C. § 1117(a). Ford is also ordered to submit a proposed injunction fourteen days from the date of the Court's order. The Court will hold a damages hearing in this case, and will announce a date and briefing schedule for the hearing in a separate order.

**An Order shall enter.**

**/s/**_____
**CURTIS L. COLLIER**
**UNITED STATES DISTRICT JUDGE**

23

24